**WELLS, Appellant,**

**v.**

**KOMATSU AMERICA INTERNATIONAL COMPANY, Appellee.**

[Cite as *Wells v. Komatsu Am. Internatl. Co.*, 162 Ohio App.3d 827, 2005-Ohio-4415.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040089.

Decided Aug. 26, 2005.

828

Mark B. Weisser, for appellant.

Montgomery, Rennie & Jonson and G. Todd Hoffpauir, for appellee.

---

SUNDERMANN, Judge.

{¶ 1} This case arises out of a wrongful-death claim filed by Kathy Wells in her individual capacity and as the administrator of her husband's estate. On the morning of October 28, 1999, Ralph Wells was part of a crew laying storm pipe for his employer, Performance Site Management, at a job site in Hamilton County, Ohio. Wells's coworker Johnny Young was operating an integrated earth-moving machine consisting of a Komatsu PC–650 LC5 excavator, a Hendrix hydraulic coupler, and an Esco 54–inch excavation bucket. Wells was working in an excavation trench, laying large concrete pipe, when the bucket unexpectedly detached from the Hendrix coupler and pinned Wells against the storm pipe. Wells died from his injuries on November 7, 1999.

## Komatsu America Corporation

{¶ 2} Performance Site Management purchased the excavator and the coupler ("the integrated product") from Columbus Equipment Company in 1995. Columbus Equipment installed the Hendrix coupler on the Komatsu excavator at Performance's request. The Komatsu excavator component was manufactured by Komatsu Ltd., a Japanese company. Defendant-appellee Komatsu America International Company, now known as Komatsu America Corporation, is the distributor for Komatsu Ltd., and it sold the excavator component at issue to Columbus Equipment. Komatsu America Corporation stipulated that pursuant to R.C. 2307.78(B)(4), it was the manufacturer of the excavator component.

## Hendrix Manufacturing Company

{¶ 3} The coupler component was manufactured by Hendrix Manufacturing Company in Louisiana. Hendrix manufactured hydraulic couplers to be used on excavators. The basic design was the same for all excavators, regardless of make or model. The only difference was that each coupler model was sized to fit the pin dimensions for each respective excavator model. Hendrix manufactured its coupler to be installed, by direct pinning, on the end of the arm of an excavator. Once installed, the coupler allowed an excavator operator to quickly change attachments, most commonly, different-sized buckets. For the particular Hendrix coupler involved in this accident, a Performance crew would typically change buckets 70 to 80 times a day. Hendrix provided purchasers with all the necessary instructions and hardware to attach a coupler to its excavator. These came in the form of a coupler hydraulic kit and an instruction manual. Hendrix's

engineers testified that Komatsu was not consulted on, and did not participate in, the design of the coupler.

## Columbus Equipment Company

{¶ 4} Columbus Equipment Company was a privately held company that sold various lines of excavators and excavator attachments. Columbus Equipment had a contract with Komatsu to sell Komatsu's products. After it was visited by a Hendrix sales representative in the early 1990s, Columbus Equipment became a dealer for Hendrix couplers. Columbus Equipment's customers typically chose which attachments to purchase for a particular excavator. Columbus Equipment would then install the attachments if requested by the customer. Sales records indicated that Columbus Equipment charged Performance Site Management for its assembly of the Komatsu excavator and Hendrix coupler involved in Wells's accident.

## The Wrongful–Death Lawsuit

{¶ 5} Wells's estate brought suit against Komatsu America Corporation, Hendrix Manufacturing Company, and Columbus Equipment Company for negligence, statutory products liability, breach of express and implied warranties, and loss of consortium. Wells's estate also sued Performance Site Management for intentional tort, fraud, and spoliation of evidence. Wells's estate sought compensatory damages, punitive damages, reasonable attorney fees and expenses, and interest. Wells's estate settled its claims with Hendrix Manufacturing Company, Columbus Equipment Company, and Performance Site Management. Wells's estate and Komatsu then filed cross-motions for summary judgment.

## Wells's Estate's Motion for Summary Judgment

{¶ 6} In its motion for summary judgment, Wells's estate argued that the Komatsu excavator was not a complete product until the Hendrix coupler was installed on it and an additional implement, in this case, a bucket, was attached to it so work could be performed. Thus, Well's estate contended that the product in this case was the Komatsu excavator equipped with the Hendrix coupler. According to Wells's estate's experts, there existed considerable physical evidence that the bucket had detached from the coupler as a result of a hydraulic pressure loss between the excavator and coupler.

{¶ 7} Wells's estate's experts opined that the coupler's design was defective because it should have incorporated a mechanical locking pin that would have retained the bucket on the coupler in the event of either operator error or hydraulic failure. Wells's estate contended that because Komatsu had provided Hendrix with excavator-arm measurements and because its agent, Columbus Equipment, had sold and physically assembled the defective coupler to the

excavator, Komatsu was strictly liable as the manufacturer of the integrated system. Wells's estate alternatively argued that even if Komatsu was not strictly liable as a manufacturer of the integrated product, it was liable as a supplier of the integrated product. Wells's estate further contended that Komatsu was strictly liable for its failure to provide postmarketing warnings in light of Komatsu's prior knowledge of the seriousness of injuries that were occurring when the Hendrix coupler was mated and sold as an integrated product with the excavator.

## Komatsu's Motion for Summary Judgment

{¶ 8} In its cross-motion for summary judgment, Komatsu argued that it was merely the manufacturer of the excavator and that Wells's estate had not contended that the excavator itself was defective when it left Komatsu's control. Thus, Komatsu argued that it was entitled to the component-parts defense. Komatsu argued that it merely manufactured and sold its excavator to Columbus Equipment, which then sold the excavator, along with the coupler, to Performance Site Management. Komatsu argued that because the integrated product became defective only after it had left its control, and because it had not participated in the assembly of the coupler or its design, it could not be strictly liable for any design defects in the coupler or for failing to provide postmarketing warnings regarding the defective coupler. Komatsu further moved for summary judgment on Wells's estate's remaining claims for negligence, breach of warranty, and punitive damages.

## Trial Court's Decision Granting Komatsu Summary Judgment

{¶ 9} The trial court granted summary judgment to Komatsu. The court held that there was no evidence that Komatsu had manufactured the integrated product. The trial court concluded that Komatsu had not designed the coupler but had merely provided specifications to Hendrix so that the coupler would mate with the excavator. The court also held that Komatsu did not have any agency relationship with Columbus Equipment for purposes of assembling the coupler on the excavator. The trial court concluded that because Komatsu had not manufactured or sold the defective coupler and because the integrated product was not the proximate cause of Wells's injuries, Komatsu was entitled to summary judgment on Wells's estate's defective-design claim. The trial court also granted summary judgment to Komatsu on Wells's estate's failure-to-warn claim, ruling that because there was no evidence that Komatsu was involved in the design or assembly of the coupler, it had no duty to warn. Likewise, the trial court granted summary judgment to Komatsu on Wells's estate's negligence and warranty claims. Wells's estate now appeals, asserting five assignments of error.

## Standard of Review

{¶ 10} We review a trial court's decision granting a motion for summary judgment de novo.[1] Summary judgment is appropriate when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."[2]

## Komatsu Did Not Manufacture the Integrated Product

{¶ 11} In its first assignment of error, Wells's estate claims that the trial court erred in holding as a matter of law that Komatsu was not the manufacturer of the integrated product. Wells's estate does not allege that the excavator component itself was defective. Instead, it contends that the Komatsu excavator was not a complete product until the Hendrix coupler was installed on it. Thus, Wells's estate submits that the product in this case was the Komatsu excavator equipped with the Hendrix coupler.

{¶ 12} In order to establish that Komatsu was the manufacturer of the integrated product under R.C. 2307.71, Wells's estate had to show that Komatsu designed, constructed, or assembled the integrated product. Both Wells's estate and Komatsu agree that under Ohio law, component-parts manufacturers are subject to strict liability for defects in a completed product only if they either construct or assemble the completed product or significantly participate in its design.[3] Consequently, Wells's estate contends that Komatsu assumed the role of manufacturer of the integrated product by (1) assembling the Hendrix coupler on the Komatsu excavator through its agent, Columbus Equipment, and (2) providing excavator-arm dimensions to Hendrix.

## Assembly of the Integrated Product

{¶ 13} Both Wells's estate and Komatsu agree that Columbus Equipment sold and assembled the integrated product. Wells's estate contends, however, that Columbus Equipment was Komatsu's agent for purposes of this assembly. Wells's estate points to various provisions in Komatsu's distributorship agree-

---

1. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

2. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267; see Civ.R. 56(C).

3. *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 271, 617 N.E.2d 1068; *Kremer v. Duriron Co.* (1987), 40 Ohio App.3d 183, 185, 532 N.E.2d 165; *Runyon v. Briggs & Stratton Corp.* (May 5, 1989), 2nd Dist. Nos. 10987 and 11185, 1989 WL 49475.

ment with Columbus Equipment as evidence of an agency relationship regarding the assembly of the integrated product.

{¶ 14} An agency relationship is created when a principal has the right to control the actions of its agent, and when the agent's actions are in furtherance of an objective that the principal seeks.[4] "The basic test is whether the principal has the right of control over the manner and means of the work being done."[5] In *Johnston v. Koebbe Enterprises, Inc.*, we held that a manufacturer could be held strictly liable under an agency theory for its distributor's installation of its product if the manufacturer, "either contractually or otherwise, actually controlled or had the right to control the installation process."[6]

{¶ 15} Relying upon our decision in *Koebbe Enterprises*, Wells's estate contends that various provisions of the Distributor Sales and Service Agreement between Komatsu and Columbus Equipment created a genuine issue of material fact as to whether Komatsu controlled or had the right to control assembly of the integrated product. Wells's estate first contends that section 8 of the agreement required Columbus Equipment to provide Komatsu with invoices of Columbus Equipment's sales of products to its customers. Section 8, however, only called for Columbus Equipment to provide written purchase orders for its customers' purchases of Komatsu products from Komatsu.

{¶ 16} Wells's estate next contends that section 16 of the agreement prohibited Columbus Equipment from selling non-Komatsu replacement parts. Section 16, however, provided only that Columbus Equipment could not market a replacement part as a "genuine Komatsu replacement part" unless the part was actually a genuine replacement part or had been approved as such by Komatsu. Wells's estate further contends that the term "replacement parts" in section 16 referred to the Hendrix coupler. However, a plain reading of the section reveals that it had no relation to after-market attachments such as the Hendrix coupler.

{¶ 17} Wells's estate also contends that sections 18 and 20 of the agreement created a genuine issue of material fact as to whether Komatsu controlled or had the right to control the installation process. Section 18 required Columbus Equipment to perform all predelivery, delivery, and postdelivery service on Komatsu products that were sold by Columbus Equipment and located within its distribution territory. Section 20 required Columbus Equipment to comply with Komatsu's policies regarding predelivery, delivery, and postdelivery service on

---

4.  *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 173, 24 OBR 403, 494 N.E.2d 1091.

5.  *Creative Hardwood Floors, Inc. v. Schafer* (Mar. 24, 1998), 5th Dist. No. 97–CA–56, 1998 WL 515783.

6.  (Nov. 1, 1995), 1st Dist. Nos. C–940241 and C–940246, 1995 WL 653877.

these products, as well as to provide users with instructions on the proper operation and maintenance of these products. While these provisions demonstrated an agency relationship between Komatsu and Columbus Equipment regarding the sale and installation of Komatsu's own products, they were completely silent regarding Columbus Equipment's sale or assembly of after-market attachments such as the Hendrix coupler.

{¶ 18} Moreover, we have reviewed the remaining provisions of the agreement between Komatsu and have found no language in the agreement that gave Komatsu the right to control the manner in which Columbus Equipment installed after-market attachments to its excavators. Nor is there any other evidence in the record that Komatsu exercised any control over the manner in which Columbus Equipment assembled the coupler to the excavator. Consequently, we cannot say the trial court erred in holding that there was no agency relationship between Komatsu and Columbus Equipment with respect to the integrated product.

## Design of the Integrated Product

{¶ 19} Wells's estate next contends that Komatsu was a manufacturer of the integrated product because it voluntarily provided excavator-arm dimensions to Hendrix Manufacturing Company so that the coupler would properly mate with its excavator.

{¶ 20} In *Roberts v. Performance Site Mgt.,* a nearly identical case, the Tenth Appellate District determined that Komatsu had no duty to warn about the allegedly defective coupler system when it had not significantly contributed to or participated in the design of the Hendrix coupler.[7] The *Roberts* case involved the death of a second Performance Site employee who was killed 14 months after Ralph Wells, when a bucket dropped from a different Hendrix coupler.[8] Because of the identity of issues and parties, several depositions, particularly of Hendrix witnesses, were taken jointly by counsel for Wells and Roberts.

{¶ 21} In transcripts that have been used in both cases, Hendrix's engineers testified that Komatsu was not consulted about, and did not participate in, the design of the Hendrix coupler. Nevertheless, Roberts's Estate contended, like Wells's estate, that Komatsu's provision of excavator-arm measurements to Hendrix made it liable for the defective Hendrix coupler. The Tenth Appellate District rejected this argument, holding that "Komatsu owed no duty to warn about the allegedly defective coupler system" when (1) Hendrix engineers had

---

7. *Roberts v. Performance Site Mgt.,* 10th Dist. No. 03AP–784, 2004-Ohio-2820, 2004 WL 1196140.

8. Id. at ¶ 2.

"testified unequivocally that Komatsu was not consulted and did not participate in the design of the coupler," (2) Komatsu had "merely provided Hendrix with general information regarding the dimensional measurements for the end of the Komatsu excavator's arm," (3) "Hendrix [had] provided all the instructions and hardware to install the coupler on the Komatsu excavator and to operate the coupler system, and [4] Columbus Equipment [had] installed the coupler, at Performance Site Management's request, onto the Komatsu excavator." [9] Because the Tenth Appellate District reviewed the identical business relationships involved in this case and because its reasoning comports with Ohio law, we adopt its analysis. Consequently, we cannot say that the trial court erred when it concluded that Komatsu did not design the coupler, but merely provided specifications to Hendrix so that the coupler would mate with the excavator.

{¶ 22} Because Wells's estate did not establish that Columbus Equipment was Komatsu's agent for purposes of the assembly of the integrated product, and because Komatsu's provision of excavator-arm dimensions to Hendrix did not make it a manufacturer of the integrated product, the trial court correctly held that Komatsu, as the manufacturer of a nondefective component part, could not be liable for an allegedly defective integrated system it did not design or assemble. Consequently, we overrule the first assignment of error.

### Komatsu Did Not Control the Integrated Product

{¶ 23} In its second assignment of error, Wells's estate contends that the trial court erred in holding that the integrated product was not in Komatsu's control at the time it entered the stream of commerce. Wells's estate contends that Komatsu had control of the integrated product through its alleged agent, Columbus Equipment. But because we have already determined that Columbus Equipment was not Komatsu's agent for purposes of the sale and assembly of the integrated product, the trial court correctly held that Komatsu did not have control of the integrated product at the time it was sold to Performance Site Management and thus that it could not be held liable for the defective design of the integrated product under R.C. 2307.75.[10] Consequently, we overrule the second assignment of error.

### Proximate Causation

{¶ 24} In its third assignment of error, Wells's estate contends that the trial court erred in determining that Ralph Wells's fatal injuries were not proximately

---

9. Id. at ¶ 16.

10. *Cervelli v. Thompson Ctr. Arms* (S.D.Ohio 2002), 183 F.Supp.2d 1032, 1037 (holding that a defective-design claim can be maintained only where the defect was present at the time it left the manufacturer's control).

caused by the integrated product. Wells's estate's defect theory was that the Hendrix coupler should have had a mechanical locking pin to ensure that the bucket would have remained secure on the coupler in the event of an operator error or hydraulic failure. But because Wells's estate alleged only that Wells's injuries were caused by the defective design of the coupler and because we have already held that Komatsu could not be deemed the manufacturer of the integrated product, Wells's estate could not succeed on its design-defect claim, irrespective of the trial court's ruling on proximate causation. Consequently, we need not determine whether the integrated product was the proximate cause of Ralph Wells's injuries. As a result, we overrule the third assignment of error.

## Komatsu Had No Duty to Provide Postmarketing Warnings

{¶ 25} In its fourth assignment of error, Wells's estate contends that Komatsu had a duty to provide postmarketing warnings about the defective coupler. Wells's estate claims that Komatsu owed a postsale duty to warn about accidents involving the Hendrix coupler because it was aware of past incidents involving unintended bucket drops, having been named as a party defendant, along with Hendrix, in two prior lawsuits.

{¶ 26} In order to survive summary judgment on its failure-to-warn claim under R.C. 2307.76, Wells's estate had to show that Komatsu manufactured the integrated product.[11] As we have already noted, there is no evidence in the record to support Wells's estate's claim that Komatsu manufactured the integrated product. Moreover, the Tenth Appellate District, in a factually analogous case, held that "Komatsu had no [postsale] duty to warn of dangers associated with the Hendrix coupler mechanism."[12] In so doing, the Tenth Appellate District rejected the same arguments that Wells's estate makes in this case.[13] Because we agree with the Tenth Appellate District's analysis in *Roberts* and find it dispositive of Wells's estate's claims, we overrule the fourth assignment of error.

## Komatsu Was Not a Supplier of the Integrated Product

{¶ 27} In its fifth assignment of error, Wells's estate contends that the trial court erred in failing to consider whether Komatsu was liable as a supplier of the integrated product under R.C. 2307.71(O)(1)(a) and (b) and 2307.78. Wells's estate asserts that even if Komatsu could not be held liable as a

---

11. See R.C. 2307.76(A)(1) and (A)(2). Both of these provisions place the duty to warn and postsale duty to warn on the manufacturer of the defective product.

12. *Roberts*, supra, note 7, at ¶ 17.

13. Id. at ¶ 17–30.

manufacturer of the integrated product, it could still be held liable as a supplier of the integrated product. Wells's estate presents four separate arguments about why Komatsu could be deemed the supplier of the integrated product.

{¶ 28} Wells's estate first contends that Columbus Equipment was Komatsu's agent for purposes of the sale of the Hendrix coupler. As we have already concluded, Columbus Equipment was not Komatsu's agent for purposes of the sale and assembly of the integrated product. Wells's estate next claims that Komatsu's provision of its excavator-arm measurements to Hendrix constituted the placing of the Hendrix coupler into the stream of commerce. But as we have already held, Komatsu's provision of measurable dimensions to Hendrix did not rise to the level of design participation that would have created any duty on Komatsu's part. Third, Wells's estate claims that Komatsu's publication in 1998 of an Attachment Directory containing the Hendrix coupler constituted placement of the coupler into the stream of commerce. As noted by the *Roberts* court, the directory was published in 1995, three years after Performance had purchased the Hendrix coupler from Columbus Equipment, and it did not give rise to a duty to warn, because the directory did not promote or "specifically recommend the use of the Hendrix coupler over any other coupler or attachment." [14] Finally, Wells's estate claims that Komatsu marketed the Hendrix coupler under Komatsu's trade name. There is simply no evidence in the record to support this assertion. The only Komatsu publication that even mentioned the Hendrix coupler, the Attachment Directory, specifically provided the following:

{¶ 29} "The attachments listed in this directory have not been designed, tested, or manufactured by Komatsu Ltd. or Komatsu America International Company and these companies assume no responsibility for their performance. The attachment manufacturer and/or selling dealer are solely responsible for any failure, personal injury, or property damage caused by the use of this equipment."

{¶ 30} Because there is no evidence in the record that Komatsu played any role in supplying the integrated product, the trial court did not err in holding that Komatsu had no supplier liability under Ohio law. Consequently, we overrule the fifth assignment of error.

{¶ 31} Because no genuine issues of material fact existed as to Wells's estate's claims, we affirm the trial court's grant of summary judgment to Komatsu.

Judgment affirmed.

DOAN, P.J., and HILDEBRANDT, J., concur.

---

14. *Roberts,* supra note 7, at ¶ 22–25.